IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROSS FRANKLIN FAREWELL,　　　　　　*
　　　　Plaintiff,
　　v.　　　　　　　　　　　　　　　　*　　CIVIL ACTION NO. PJM-13-1204

BOBBY P. SHEARIN, et al.,　　　　　　*
　　　　Defendants.
　　　　　　　　　　　　　　　　　　***

**MEMORANDUM OPINION**

Pending is a Motion to Dismiss, or in the alternative Motion for Summary Judgment filed on behalf of Defendants Warden Bobby P. Shearin and Division of Correction. ECF Nos. 25 & 27. Plaintiff has responded. ECF No. 33. Upon review of papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, the dispositive motion filed by Defendants will be granted.

Background

Plaintiff states that on July 7, 2012, Bobby Shearin, Warden of the North Branch Correctional Institution ("NBCI"), issued a directive that inmates would no longer be permitted to order books unless the books were pre-approved books for educational or religious correspondence courses. Department heads were tasked with authority to approve the inmates' requests. ECF No. 1.

Plaintiff states that on July 27, 2012, he wrote to the head of the Education Department requesting pre-approval for a legal thesaurus. His request was denied. *Id*. Plaintiff states that he filed a request for administrative remedy and days prior to exhausting his grievance at the Inmate Grievance Office, the Department of Public Safety and Correctional Services (DPSCS) re-evaluated Plaintiff's grievance and found it meritorious. *Id*. Plaintiff states that the IGO found that policy regarding pre-approval of books violated his First Amendment rights. *Id*. However, his efforts to

1

have the Warden enjoined from implementing the policy were denied by the Administrative Law Judge who claimed lack of jurisdiction to consider the request. *Id*.

On January 28, 2013, Shearin revised the policy on allowable books, instituting, in Plaintiff's opinion, a harsher and more restrictive policy which required inmates to order books from 14 approved vendors. ECF Nos. 1 & 21. Plaintiff states that the new policy requires his book order be pre-approved by the housing unit manager before it is sent to the property officer who documents the book order. The order is then sent to his case manager, who places a copy of the order in the inmate's base file before forwarding the order to the business office for final processing. *Id*. Plaintiff states that the policy violates his rights under the First Amendment to receive books from a free society. *Id*. Plaintiff seeks injunctive relief as well as damages. *Id*.

By way of amended complaint, Plaintiff allege he has been denied access to affordable products through restrictions on his commissary purchases. ECF No. 21. Specifically, Plaintiff states he has been denied the right to order a replacement beard trimmer through the vendor of his choice, but rather must order through the commissary at a higher price. He alleges that this is a consumer monopoly in violation of consumer protection laws. *Id*.

Plaintiff also alleges he was transferred from NBCI to the Western Correctional Institution (WCI) in an effort to "moot" his claims. *Id*.

For their part, Defendants indicate that Plaintiff was transferred from NBCI to WCI on June 7, 2013, to meet his programming needs. ECF No. 25, Exs 1 & 2. NBCI is a maximum security prison, housing approximately 1500 maximum security inmates, most of whom are serving life sentences. *Id*., Ex. 2. Shearin avers that the population of NBCI tends to contain those serving longer sentences and who are involved in gangs, with poor institutional adjustment histories including escape and assaultive behavior. *Id*.

Shearin avers that contraband, including weapons, handcuff keys, and drugs were entering NBCI by being concealed in books sent by individuals posing as legitimate vendors. On July 13, 2012, NBCI changed its Institutional Directive 220.007.1 concerning books, to read as follows: "Inmates at NBCI will not be allowed order books unless they are pre-approved correspondence courses for Education and/or Religious Course." *Id*.

On January 11, 2013, as a result of an ARP filed by Plaintiff, the Director of Program Services ordered the institutional directive changed in order to conform with Division of Correction Directives. *Id*. On January 16, 2013, the institutional directive was changed to read as follows:

> Inmates at NBCI may order books only from vendors approved by the appropriate Department Head/Unit Manager, Chief of Security and/or the Assistant Warden. The books must meet the criteria set forth in DCD.250.0001, DOC regulations, and NBCI.ID.250.0001.01.1 and may not exceed the 1.5 cubic feet allowed for storage space set forth in the "Allowable Inmate Property Matrix" for books/papers and magazines/newspapers.

*Id*., Ex. 3.

All incoming books are processed through NBCI's property room. They are x-rayed, scanned and visually inspected for signs of tampering and for the presence of contraband. *Id*., Ex. 2. Three officers assigned to the NBCI Property Room are responsible for receiving, examining and distributing all inmate property arriving at the institution. *Id*.

Warden Shearin does not personally review inmate requests for books. *Id*. Plaintiff filed ARP NBCI 2221-12 claiming he wrote the education department requesting to order a legal thesaurus and his request was denied. Shearin did not review or sign the August 16, 2012 response. *Id*.

On January 17, 2013, Plaintiff placed a book order through vendor Edward R. Hamilton Bookseller Company. The order included a Burton's Legal Thesaurus, Teach Yourself to Read and Write Arabic, and an Easy Arabic Reader. *Id*. Plaintiff received and signed for these books on February 6, 2013. *Id*.

3

On October 23, 2012, copies of Black's Law Dictionary were placed in each Housing Unit and in the main library at NBCI for inmate use. *Id.*, Ex. 4. Computers containing legal dictionaries are present in the main library and in each housing unit. *Id.* The main library at NBCI also contains a thesaurus for inmate use. Legal dictionaries and legal thesaurus were available for inmates' use prior to Plaintiff's ordering of the thesaurus. Additionally, inmates have access to magazines, library books, and the "Daily Record" newspaper. *Id.*

NBCI inmates have access to televisions and correspondence by mail. *Id.*, Ex. 5. Inmates assigned to general population have access to televisions in the day rooms which may be used during recreation periods. Plaintiff was housed in general population at NBCI from February, 2009 until his transfer to WCI in June of 2013. *Id.*

Due to security concerns inmates are permitted to purchase certain electronic items, including beard trimmers and CD players, only through the institutional commissary. *Id.*, Ex. 2. Where items are unavailable from the commissary and are otherwise permissible, they may be purchased through catalog ordering. *Id.*

**Standard of Review**

A.  Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court need not, however, accept

4

unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B. Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Analysis

A.  Sovereign Immunity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. State Gov't Code Ann., § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Plaintiff's complaint against the

6

Division of Corrections, an agency within the State of Maryland, is barred by the Eleventh Amendment.

B.   Injunctive Relief

"'[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)). " 'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *Id.* (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)). An actual controversy must exist at all times while the case is pending. *See Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974). Where developments occur during the course of a case which prevent the court from being able to grant the relief requested, the case must be dismissed. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…" *See Lewis v. Continental Bank Corp,* 494 U.S. 472, 480 (1990). "[O]ne such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim." *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002) (citing Broughton v. North Carolina, 717 F. 2d 147, 149 (4th Cir. 1983).

To the extent Plaintiff seeks injunctive relief, his request has been rendered moot. Since the filing of the Complaint, Plaintiff has been moved from NBCI to WCI and is no longer subject to the policies of which he complaints. Accordingly, the request for injunctive relief shall be denied

C.   First Amendment

7

Prisoners have a limited First Amendment right to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir. 2006). Regulations that affect the sending of mail to prisoners are centrally concerned with maintenance of prison order and security, and are measured under the reasonableness test of *Turner v. Safley*, 482 U.S. 78 (1987). In upholding a prison regulation which permitted the ban of certain publications upon a determination by the warden of the prison that the publication is "detrimental to the security, good order, or discipline of the institution or ... might facilitate criminal activity," the Supreme Court stated that security concerns must be balanced against the First Amendment interest involved in providing publications to inmates. *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). Such regulations are valid if reasonably related to legitimate penological interests, giving prison officials considerable deference in regulating the delicate balance between prison order and demands of "outsiders" who seek to enter the prison environment. *Id*.; *see also United States v. Stotts*, 925 F.2d 83 (4th Cir. 1991) (legal mail); *Vester v. Rogers*, 795 F.2d 1179 (4th Cir. 1986).

In examining the action of prison officials under the *Thornburgh* and *Safley* standards, this Court must determine (1) whether the governmental objective underlying the regulations is legitimate, neutral and rationally related to that objective; (2) whether there are other ways a prisoner may exercise his right to receive information; (3) what impact the accommodation of the asserted constitutional right will have on others in the prison; and (4) whether there exists an obvious, easy alternative to the regulation to ensure that the regulation is not an exaggerated response to prison concerns. *See Thornburgh*, 490 U.S. at 417-418;*Turner*, 482 U.S. at 90.

The Court finds that the Institutional Directive is reasonably related to a valid security concern designed to prevent contraband smuggling and protect others within the prison walls. As in

*Thornburgh*, the Institutional Directive at issue here was unrelated to the suppression of expression. Rather, it was enacted in order to further the important penological goal of institutional security by limiting the import of contraband into the facility. *Id.*, Ex. 3.

Further, Plaintiff was not harmed when subject to either iteration of the institutional directive as alternative means of expression were available to him. The information sought by Plaintiff, a legal thesaurus, was available to him via the institutional and housing unit libraries and computers. Further, at all times Plaintiff had access to magazines, newspapers, legal materials, a television, and the ability to write and receive correspondence.[1] Moreover, after the directive was amended, Plaintiff received all of the books he requested.

No easy alternative to the regulation is readily apparent. Limiting receipt of books from authorized vendors in order to advance institutional security is not an exaggerated response to prison security concerns. In short, Plaintiff's First Amendment rights were not violated under the facts presented here.

D.  Access to the Courts

To the extent Plaintiff alleges the limitation on his receipt of books adversely impacted his ability to file lawsuits, his claim fails. Prisoners have a constitutionally protected right of access to the courts. *Bounds v. Smith*, 430 U. S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

---

[1] Plaintiff and other inmates aver that frequently the legal library was closed to inmates. ECF No. 33. No harm has been shown by the limited access to the library.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) *quoting Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Plaintiff has pointed to no injury he suffered in his ability to file a lawsuit relative to the Institutional Directive.

E.   Commissary Claim

In order for Plaintiff to prevail on his claim regarding the requirement that he order certain items from the commissary rather than through mail order catalogs, he must establish that the establishment of the commissary system has somehow infringed on a constitutionally protected right and has caused him an injury. *See White v. White*, 886 F.2d 721, 723-24 (4th Cir. 1989) (holding that it was proper for district court to dismiss a prisoner's claim that contained no allegation of specific injury related to a delay in legal mail). This he has failed to do.

Plaintiff alleges that requiring him to order from the commissary violates antitrust laws. ECF No. 21. Antitrust laws do not apply to the operation of state agencies. *See Parker v. Brown*, 317 U.S. 341, (1943); *Washington Gas Light Co. V. Virginia Electric & Pow. Co.*, 438 F. 2d 248 (4th Cir. 1971). Further, there is no freestanding constitutional right to commissary privileges. *See Madison v. Parker*, 104 F. 3d 765, 768 (5th Cir. 1997). Additionally, the institutional regulation requiring certain appliances be ordered solely through the state sanctioned commissary has a valid and rational connection to the important penological goal of institutional security. ECF No. 25, Ex. 2.

F.  Failure to follow directives

As noted above, the Court finds that the Institutional Directives regarding receipt of publications from outside vendors does not violated Plaintiff's First Amendment rights. To the extent that written directive were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[2]

G.  Transfer

To the extent Plaintiff alleges his transfer from NBCI to WCI was retaliatory, his claim fails. In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

Plaintiff offers nothing in support of his claim other than self-serving conclusory averments. There is nothing in the record to suggest that Defendants acted in the manner alleged. Moreover, Shearin avers that Plaintiff was transferred to WCI in order to better meet his programming needs. Lastly, Plaintiff's transfer to WCI does not in and of itself implicate a liberty interest; he has no entitlement to notice and an opportunity to be heard prior to his transfer because as a prisoner he has

---

[2] Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

11

no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976).

**Conclusion**

The dispositive motion filed on behalf Warden Bobby P. Shearin and Division of Correction will be granted. A separate Order follow.

March 11, 2014

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE